**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 95-50426

FM PROPERTIES OPERATING COMPANY

Plaintiff - Appellee

VERSUS

CITY OF AUSTIN

Defendant - Appellant

Appeal from the United States District Court
for the Western District of Texas

August 14, 1996

Before SMITH, DUHÉ, and DeMOSS, Circuit Judges.

DUHÉ, Circuit Judge:

FM Properties Operating Company ("FMP") sued the City of Austin, Texas, under 42 U.S.C. § 1983, claiming the City arbitrarily and capriciously rejected its application for a land development permit, thereby violating its Fourteenth Amendment substantive due process rights. The district court entered judgment on a jury verdict in favor of FMP, and the City appealed. Because we find that FMP has failed to state a constitutional claim, we reverse the judgment and remand to the district court to

dismiss.

I.

**A. *House Bill 4***

In 1987, the Texas Legislature enacted the Texas Department of Commerce Act, Acts 1987, 70th Leg., ch. 374, § 1 (eff. Sept. 1, 1987) (current version at Tex. Gov't Code Ann. § 481.101 et seq. (West 1990 & Supp. 1996)). At all times pertinent to this litigation, § 481.143(a) ("House Bill 4") provided:

> The approval, disapproval, or conditional approval of an application for a permit shall be considered by each regulatory agency solely on the basis of any orders, regulations, ordinances, or other duly adopted requirements in effect at the time the original application for the permit is filed. <u>If a series of permits is required for a project, the orders, regulations, ordinances, or other requirements in effect at the time the original application for the first permit in that series is filed shall be the sole basis for consideration of all subsequent permits required for the completion of the project</u>.

Tex. Gov't Code Ann. § 481.143(a) (West 1990) (emphasis added) (amended 1995).[1] On September 1, 1987, the effective date of House Bill 4, the Austin City Manager delivered to the City Council a proposed interpretation of House Bill 4 that advocated treating the land development process as involving, in House Bill 4 rubric, two separate "projects." The City Council unanimously adopted this construction, and since 1987 has divided land development

---

[1]A "project" is "an endeavor over which a regulatory agency exerts its jurisdiction and for which a permit is required before initiation of the endeavor." Tex. Gov't Code Ann. § 481-142(3) (West 1990) (amended 1995). "Endeavor" is not a defined term in the Act.

2

activities into two projects, each involving a "separate and independent series" of permits--i.e., that series of permits necessary for subdividing unplatted, raw land into legal lots and that series of permits necessary for vertical construction on existing legal lots.

In the subdivision project, the application for preliminary subdivision plat approval is the first in the series of necessary permits. Under the City Council's House Bill 4 policy, the filing of this initial application freezes those ordinances and regulations in effect on that date, such that the City Council's consideration of the remaining permits required to obtain final subdivision plat approval is controlled by those regulations and ordinances, regardless of any subsequent enactments, amendments, or repeals. Likewise, a site plan application is the first permit application in the series of permits required for approval of construction on subdivided property. The filing of the site plan application freezes those ordinances and regulations in effect on its filing date to govern the remainder of this permit process.

In August 1991, the City Attorney submitted a legal opinion to the City Council stating that its House Bill 4 policy was valid under Texas law. In the opinion letter, the City Attorney explained the purpose of the two-project policy:

> It is well known that property is often subdivided for speculative reasons with no plans beyond enhancing the property's value and making it marketable. The City has no way to determine what a person envisions as the ultimate result when particular applications are filed. Therefore,

3

short of making a factual determination as to what each person's "project" is when each application is filed, the only way to resolve this issue is to make a reasonable determination as to what ordinarily constitutes a "project." The City has done this by using the Series 1 and Series 2 divisions, which is a reasonable, objective, and factually based treatment of development applications.

If any action, including zoning . . . , were to freeze development regulations, the result would be to eliminate recent subdivision and site development regulations (including watershed regulations) for much of the property within the city and the extraterritorial jurisdiction. Virtually all of the property within the city limits has been zoned, and much of the property within the extraterritorial jurisdiction has been, or is in the process of, being subdivided; this would mean that these properties would be subject to regulations which may already be outdated. Furthermore, the interpretation favored by those who disagree with the City's policy would essentially prohibit any changes to subdivision and site development regulations. This would permit persons to develop property under outdated and substandard regulations.

For example, a developer would not have to build in accordance with the latest building, fire, plumbing, mechanical, or electrical codes, but would be permitted to build under codes that might be years old. In addition, the developer would not be required to comply with drainage and watershed regulations. This would result in shoddy development and create an obvious public safety problem which could expose the developer, and possibly the City, to liability for personal injury. This result is contrary to the public interest in health, safety, and welfare.

**B.  *Factual history***

In 1987, FMP's predecessor in interest purchased 4,000 acres in the Barton Creek Watershed outside of Austin. When purchased its development was governed by the City's 1986 Comprehensive Watershed Ordinance.[2]  Early in 1991, the 1986 ordinance was

_____

[2]Texas law allows municipalities to enact water quality standards applicable to the preservation and development of lands outside of

4

replaced with an interim watershed ordinance effective for six months. When the interim ordinance expired, the City Council passed a two month moratorium on development. The City Council then replaced the moratorium with the 1991 Composite Watershed Ordinance.

Thereafter, on April 8, 1992, FMP's predecessor in interest submitted thirteen applications for preliminary subdivision plat approval to the City.[3] Two months later, FMP's predecessor in interest transferred the 4,000 acres to FMP. Between December 1992 and April 1993, the City approved all thirteen preliminary subdivision plans.

On July 28, 1992, FMP filed a site plan application proposing development of a 198-unit multifamily complex called "The Falls." Under the City's Land Development Code, the site plan application would expire on July 26, 1993, if all steps for its approval were not completed by then. The City alerted FMP that the site plan application could not be approved until a final subdivision plat was approved and extended FMP's site plan application approval

the municipalities' corporate limits, in an area referred to as the municipalities' extraterritorial jurisdiction. See, e.g., Tex. Local Gov't Code Ann. § 212.003(a) (West Supp. 1996) and § 401.002 (West 1988); Tex. Water Code Ann. § 26.177(b) (West Supp. 1996). FMP's property is in the City's extraterritorial jurisdiction.

[3]The City's Land Development Code requires that land development applications be approved in the following order, as applicable: (1) zoning (if property is within city limits); (2) subdivision (preliminary and final plat approval); (3) site plan (if usage other than single family residential); and (4) building permits.

deadline to August 23, 1993. FMP then filed a final subdivision plat application and amended its site plan application to reduce the size of the development to 41 units. Final subdivision plat approval was received on August 24, 1993, the day after FMP's site plan application expired. The City rejected the site plan application for that reason.[4] FMP refiled the 41-unit site plan application in October 1993.

After FMP filed its original site plan application, a citizen initiative to strengthen water quality protection in the Barton Creek area resulted in passage of a referendum in August 1992 referred to as the SOS Ordinance. The City Council thereafter codified the SOS Ordinance effective September 14, 1992, replacing the 1991 Composite Watershed Ordinance.

Because FMP's original site plan application expired, the City Council considered FMP's October 1993 site plan application the first permit application necessary for approval of construction of The Falls. Since this application was filed after enactment of the SOS Ordinance, the City Council judged the application for compliance with that ordinance, as opposed to the 1991 Composite Watershed Ordinance which was in effect when FMP's predecessor filed for preliminary subdivision plat approval. Finding the site plan application did not comply with the requirements of the SOS

_____

[4]The City admits that had FMP timely completed those steps prerequisite to consideration of a site plan application, the 41-unit site plan application would have complied with the 1991 Composite Watershed Ordinance.

6

Ordinance, the City Council rejected it.

## C. Course of proceedings

FMP sued the City under 42 U.S.C. § 1983 claiming the City violated FMP's Fifth and Fourteenth Amendment rights and seeking declaratory and injunctive relief, and damages. Following several motions FMP's complaint was reduced to a single claim that the City arbitrarily and capriciously rejected the October 1993 site plan application.[5] FMP moved for partial summary judgment, and the district court referred FMP's motion to a magistrate judge who concluded that (1) as a matter of law, House Bill 4 created in FMP a property interest in having those ordinances and regulations in effect on April 8, 1992, the date it filed for preliminary subdivision plat approval, applied throughout the process of developing The Falls, and (2) as a matter of law, the City is collaterally estopped by the state-court decision in Quick v. City of Austin (holding that the SOS Ordinance is void) from reasserting the validity of that ordinance in this litigation. The district court approved the magistrate's report, and a jury trial was held on FMP's lone remaining constitutional claim.

The jury found that the City violated FMP's substantive due

_____

[5]On the City's motion, the district court dismissed FMP's Fifth Amendment takings claim as unripe. FMP then amended its complaint to raise only Fourteenth Amendment substantive due process and equal protection claims. By a subsequent voluntary motion, FMP dismissed all of its claims, except the substantive due process complaint based on the City's decision to deny its October 1993 site plan application.

7

process right by denying its site plan application for noncompliance with the SOS Ordinance and returned a verdict for FMP for $113,888 in damages. In accordance with the verdict, the district court entered judgment in favor of FMP and ordered the City to pay FMP damages of $113,888, to consider any future permit applications for land development under the regulations and ordinances in effect at the time the original preliminary subdivision plat application is filed, to consider any land development permit application filed by FMP with respect to its property in the Barton Creek Watershed under the regulations and ordinances in effect when FMP filed its original preliminary subdivision plat applications, and to approve FMP's October 1993 site plan application for The Falls development upon FMP's showing that it complies with the regulations and ordinances in effect when FMP filed its original preliminary subdivision plat application for that project. The City appealed.

## II.

Amidst the flurry of arguments made by the City assailing the district court's decision, we find a single issue dispositive of this appeal. The City maintains that FMP has failed to state a substantive due process claim. Specifically, the City contends that its House Bill 4 policy and its decision pursuant thereto to apply the SOS Ordinance to FMP's October 1993 site plan application were neither arbitrary nor capricious. Rather, the City claims the

8

policy is necessary to prevent the application of outdated, substandard rules and regulations to the development process, and its decision respecting FMP's site plan application furthered this purpose. Accordingly, the City argues its actions are rationally related to the legitimate government purpose of protecting the public health, safety, and welfare, and FMP has failed to state a claim for violation of its substantive due process rights. We agree.[6]

---

[6]The City objected at trial to, and argues on appeal that the district court erred by, submitting the first special interrogatory to the jury on the ground that the interrogatory posed only a question of law, the resolution of which is outside the province of the jury. FMP, however, alleges that the City acted arbitrarily and capriciously, inasmuch as its conduct was motivated by an improper goal to deny FMP the right to develop its property, and contends this issue is one of fact. As such, argues FMP, the question was properly submitted to the jury, the jury clearly found arbitrariness in the actions of the City leading up to and culminating in the denial of FMP's site plan application, and these factual findings are to be reviewed only for clear error.

The contested interrogatory asked: "Do you find by a preponderance of the evidence that the Defendant violated the Plaintiff's constitutional right to substantive due process when it disapproved the site plan application for 'the Falls' development project on November 11, 1993, by insisting that the application comply with the SOS Ordinance?" Clearly, this poses a question of law. See Hatton v. Wicks, 744 F.2d 501, 503 (5th Cir. 1984) ("The sole question which is before us, then, is whether the existence of these facts and these events constitutes a violation of appellant Hatton's civil rights under the due process of law clause of the Fourteenth Amendment. That question obviously is a question of law, a question of the interpretation and application of the Constitution.").

Likewise, the district court charged the jury: "With respect to the first element [of a cause of action under § 1983], deprivation of a property interest rises to the level of a substantive due process violation if the conduct was arbitrary and capricious, which means that it was done for an improper motive and lacking in any conceivable rational basis." (Emphasis added). Continuing, the district court instructed the jury that "[t]o establish that

9

FMP disagrees with the City's characterization of this case. FMP claims that over a three year period the City intentionally delayed processing its permit applications and purposefully manipulated drainage and water-quality standards pertaining to the Barton Creek Watershed to prevent its development efforts. As a result, argues FMP, the City violated its substantive due process rights by engaging in an arbitrary and capricious course of conduct aimed at preventing it from developing its Barton Creek property, which conduct culminated in the November 1993 City Council decision to deny FMP's site plan application.

While FMP's amended complaint and appellate brief attempt to

the [City] acted arbitrarily and capriciously, [FMP] must prove that the [City] could have had no legitimate reason for its decision to apply the SOS Ordinance to [FMP's] site plan application." These instructions, as a whole, asked the jury to determine whether a rational basis existed for the City Council's action.

Whether a particular zoning action has the requisite rational relationship to a legitimate government interest is a question of law to be decided by the court. See Midnight Sessions, Ltd. v. City of Philadelphia, 945 F.2d 667, 682 (3d Cir. 1991), cert. denied, 503 U.S. 984 (1992), cited with approval by Parkway Garage, Inc. v. City of Philadelphia, 5 F.3d 685, 692 (3d Cir. 1993); cf. League of United Latin Am. Citizens v. Clements, 999 F.2d 831, 871 (5th Cir. 1993) (en banc), cert. denied, 510 U.S. 1071 (1994) (noting that "[w]ith issues of substantive due process, equal protection, and the First Amendment, the weight of a state's interest has always been a legal question, not a factual one.").

On this record, then, the jury made no findings of fact of which we are apprised, and the district court erred insofar as it submitted only a question of law to the jury. Such error warrants reversing and remanding this cause for a new trial. But, because we conclude as a matter of law that FMP has failed to state a constitutional violation, and thus we reverse the judgment and render a decision in favor of the City, we do not rely on this error to resolve this appeal.

10

place a "totality of the circumstances" slant on its allegations of unconstitutional misconduct by the City, in its intervening pleading for voluntary dismissal of its equal protection and alternate substantive due process claims, FMP admitted that dismissal of those claims "leaves a single constitutional claim to be decided by the jury:  whether the City of Austin violated FM Properties' substantive due process rights when the City insisted that the site plan application for the Falls filed October 25, 1993, comply with the SOS Ordinance."  Thus, FMP pared its substantive due process claim to the minimal accusation that the City acted arbitrarily and capriciously in November 1993 when it insisted that FMP's October 1993 site plan application comply with the SOS Ordinance and refused to approve the application for noncompliance.

Based on FMP's concessions, the district court, when charging the jury instructed:

> The Plaintiff claims that the Defendant, while acting "under color of state law," intentionally deprived the Plaintiff of rights under the Constitution of the United States.

> Specifically, Plaintiff claims that the City of Austin violated Plaintiff's substantive due process rights when it arbitrarily and capriciously disapproved Plaintiff's site plan application for "The Falls" development project on November 11, 1993, by insisting that the resubmitted application comply with the SOS Ordinance.

Further, the district court instructed the jury that, in the event it determined damages were due FMP, those damages were "limited to compensatory damages accruing after November 11, 1993, . . . which

11

directly resulted from the denial of the site plan application for 'the Falls' development project." FMP did not object to either instruction. Additionally, of the two special interrogatories submitted to the jury, the first asked the jury whether the evidence established "that the [City] violated [FMP's] constitutional right to substantive due process when it disapproved the site plan application for 'the Falls' development project on November 11, 1993, by insisting that the application comply with the SOS Ordinance."[7] Again, FMP raised no objection.

This case was tried, and the jury was instructed, on the narrow issue of the constitutionality of the City's decision to deny FMP's October 1993 site plan application. Neither in post-trial motions, nor on appeal, does FMP raise as error the district court's failure to instruct the jury or to submit an interrogatory on a course-of-conduct theory of unconstitutional wrongdoing. As such, FMP abandoned this claim in the district court, MacArthur v. University of Tex. Health Ctr. at Tyler, 45 F.3d 890, 895 (5th Cir. 1995), and we do not consider on appeal a claim not presented to the district court, Portiss v. First Nat'l Bank of New Albany, 34 F.3d 325, 331 (5th Cir. 1994); McLean v. International Harvester Co., 902 F.2d 372, 374 (5th Cir. 1990). Thus, we need only decide whether the City violated FMP's substantive due process rights by

_____

[7]The second special interrogatory simply asked, in the event of an affirmative answer to the first interrogatory, for the amount of damages.

12

denying FMP's October 1993 site plan application for noncompliance with the SOS Ordinance.

We begin our analysis by noting that FMP's focus on the City Council's decision to deny its site plan application is misplaced. FMP has never contended that its site plan application complied with the SOS Ordinance, and the decision to deny FMP's site plan application resulted from a straight-forward application of the City Council's House Bill 4 policy. Consequently, if the City Council can divide the land development process into two separate projects or series of permits, as its House Bill 4 policy proposes, then surely its denial of FMP's site plan application pursuant to a routine application of this legitimate practice was rational. Accordingly, FMP's complaint actually emerges as a claim that the House Bill 4 policy, in and of itself, is so arbitrary and capricious as to deprive FMP of its substantive due process rights.

"We have long insisted that review of municipal zoning is within the domain of the states, the business of their own legislatures, agencies, and judiciaries, and should seldom be the concern of federal courts." Shelton v. City of College Station, 780 F.2d 475, 477 (5th Cir.) (en banc), certs. denied, 477 U.S. 905 and 479 U.S. 822 (1986). Nonetheless, when challenges to such land-use decisions aspire to constitutional stature, we view those decisions as "quasi-legislative" in nature, and thus sustainable against a substantive due process challenge if there exists therefor "any conceivable rational basis." Id.; South Gwinnett

13

Venture v. Pruitt, 491 F.2d 5, 7 (5th Cir.) (en banc), certs denied, 416 U.S. 901 and 419 U.S. 837 (1974).  In other words, such government action comports with substantive due process if the action is rationally related to a legitimate government interest.  Schafer v. City of New Orleans, 743 F.2d 1086, 1089 (5th Cir. 1984); Couf v. DeBlaker, 652 F.2d 585, 588 (5th Cir. 1981), cert. denied, 455 U.S. 921 (1982); Stone v. City of Maitland, 446 F.2d 83, 87 (5th Cir. 1971).  Only if such government action is "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare," may it be declared unconstitutional.  Village of Euclid v. Ambler Realty Co., 272 U.S. 365, 395 (1926); Shelton, 780 F.2d at 483 ("Only if the governmental body could have had no legitimate reason for its decision" is federal judicial interference proper.).

FMP's argument that the City Council's House Bill 4 policy is arbitrary and capricious is two-fold:  (1) the City Council's interpretation of House Bill 4 is incorrect and so irrational; and (2) the City Council's interpretation bears no rational relationship to any legitimate government interest.  With respect to the correctness of the City Council's interpretation of House Bill 4, we note that "[t]he power to decide, to be wrong as well as right on contestable issues, is both privilege and curse of democracy."  National Paint & Coatings Ass'n v. City of Chicago, 45 F.3d 1124, 1127 (7th Cir.), cert. denied, __ U.S. __, 115 S.Ct. 2579 (1995).  Ergo, "the due process clause does not require a

14

state to implement its own law correctly[, nor does] [t]he Constitution . . . insist that a local government be right." Gosnell v. City of Troy, 59 F.3d 654, 658 (7th Cir. 1995) (citations omitted). Indeed, "[c]onverting alleged violations of state law into federal . . . due process claims improperly bootstraps state law into the Constitution." Stern v. Tarrant County Hosp. Dist., 778 F.2d 1052, 1056 (5th Cir. 1985) (en banc), cert. denied, 476 U.S. 1108 (1986). As such, assuming, without deciding, that the City Council has wrongly interpreted House Bill 4, a violation of state law is alone insufficient to state a constitutional claim under the Fourteenth Amendment.[8] See id.; see also Neuwirth v. Louisiana State Bd. of Dentistry, 845 F.2d 553, 558 (5th Cir. 1988), Brennan v. Stewart, 834 F.2d 1248, 1255 n.11 (5th Cir. 1988); Smith v. City of Picayune, 795 F.2d 482, 488 (5th Cir. 1986).

---

[8]After FMP amended its complaint, the City moved the district court to abstain from deciding this case under Railroad Comm'n of Tex. v. Pullman Co., 312 U.S. 496 (1941), and Burford v. Sun Oil Co., 319 U.S. 315 (1943). The City argued that, because the case focused solely upon important issues of state and local land use planning policy, and specifically the proper interpretation of House Bill 4, federal intrusion into this area of immense state concern was unwarranted and inappropriate. The district court, however, disagreed and refused to abstain.

The City is correct that FMP's alleged constitutional injury boils down to a claim that the City incorrectly interpreted state law. However, because the correctness of the City's interpretation of House Bill 4 is irrelevant on the record of this case to whether FMP has stated a claim for deprivation of its substantive due process rights, and thus resolution of this case does not require that we immerse ourselves into any important issues of state law, we concur in the district court's refusal to abstain.

As to FMP's claim that the City Council's House Bill 4 policy has no rational relationship to any legitimate government interest, we observe that "the 'true' purpose of the [policy], (i.e., the actual purpose that may have motivated its proponents, assuming this can be known) is irrelevant for rational basis analysis. The question is only whether a rational relationship exists between the [policy] and a <u>conceivable</u> legitimate governmental objective." <u>Smithfield Concerned Citizens for Fair Zoning v. Town of Smithfield</u>, 907 F.2d 239, 246 (1st Cir. 1990). If the question is at least debatable, there is no substantive due process violation. <u>Village of Euclid</u>, 272 U.S. at 388; <u>Shelton</u>, 780 F.2d at 483 (quoting <u>Minnesota v. Clover Leaf Creamery Co.</u>, 449 U.S. 456, 464 (1981)).

Through experience, the City discovered that subdivision of a tract of land often precedes construction on the same tract by a number of years and that these activities are frequently undertaken by different parties. The City Council, therefore, adopted its House Bill 4 policy treating these two activities as separate projects to ensure land developers would be made to comply with the most current standards at each stage of development. Assuring such compliance would avoid inferior, and thus potentially hazardous, construction as well as ecologically and environmentally insensitive development, thereby advancing the health, safety, and

16

welfare of the City and its citizens.[9]

The City Council's legislative findings with respect to its House Bill 4 policy are cloaked with a presumption of validity, Schafer, 743 F.2d at 1089 (citing Goldblatt v. Town of Hempstead, 369 U.S. 590 (1962)); South Gwinnett Venture, 491 F.2d at 7, and so we give them much deference, see Horizon Concepts, Inc. v. City of Balch Springs, 789 F.2d 1165, 1167-68 (5th Cir. 1986).  In fact, our deference is so substantial that FMP, to successfully challenge this legislative judgment, "'must convince the court that the

---

[9]Supreme Court jurisprudence "[has] not elaborated on the standards for determining what constitutes a 'legitimate state interest[,]' [but has] made clear . . . that a broad range of governmental purposes and regulations satisfy these requirements." Nollan v. California Coastal Comm'n, 483 U.S. 825, 834-35 (1987).  It is settled, however, that zoning actions "must find their justification in some aspect of the police power, asserted for the public welfare."  Village of Euclid, 272 U.S. at 388.  In this vein, the Court has stated:

> The concept of the public welfare is broad and inclusive. . . .
> The values it represents are spiritual as well as physical,
> aesthetic as well as monetary.  It is within the power of the
> legislature to determine that the community should be beautiful
> as well as healthy, spacious as well as clean, well-balanced as
> well as carefully patrolled.

Village of Belle Terre v. Boraas, 416 U.S. 1, 6 (1974) (quoting Berman v. Parker, 348 U.S. 26, 33 (1954)).
In this case, the City Council's House Bill 4 policy is intended to protect the citizens of Austin, as well as to preserve the landscape, waterways, and other environmental aspects considered unique to the Austin area, by forcing land developers to comply not only with the most up-to-date building quality and safety standards, but also with the most advanced water quality, drainage, and other environmentally related regulations.  Based on the expansiveness of the concept of the "public welfare" in this context, we conclude that these objectives constitute legitimate government interests.

17

legislative facts on which the [decision] is apparently based could not reasonably be conceived to be true by the governmental decisionmaker.'" <u>Shelton</u>, 780 F.2d at 479 (quoting <u>Vance v. Bradley</u>, 440 U.S. 93, 110-11 (1979)). FMP has made no such showing, and thus we are bound to accept the City Council's findings. <u>Horizon Concepts, Inc.</u>, 789 F.2d at 1168. Rational basis review under the Due Process Clause of the Fourteenth Amendment does not authorize the federal judiciary to sit as a superlegislature to judge the wisdom or desirability of state legislative policy determinations. <u>Exxon Corp. v. Governor of Maryland</u>, 437 U.S. 117, 124 (1978) (citing <u>Ferguson v. Skrupa</u>, 372 U.S. 726, 731 (1963)). Thus, accepting as we must the City Council's determinations, we conclude that the existence of a rational relationship between the House Bill 4 policy and the City Council's stated goal of guarding against the hazards of substandard land development is at least debatable, such that FMP has failed, in this respect, to state a constitutional violation.

## III.

Because we conclude that FMP has failed to show that the City Council's decision to deny its site plan application worked a deprivation of its Fourteenth Amendment substantive due process rights, we REVERSE the judgment of the district court and REMAND to the district court to DISMISS this cause.

18