# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

June 27, 2017

Lyle W. Cayce
Clerk

No. 16-10767

MIRNA REYES; EMMANUEL LEWIS; JENNIFER BUNCH; DEBORAH GILBERT,

>          Plaintiffs - Appellants

v.

NORTH TEXAS TOLLWAY AUTHORITY, (NTTA),

>          Defendant - Appellee

Appeal from the United States District Court
for the Northern District of Texas

Before STEWART, Chief Judge, and HIGGINBOTHAM and COSTA, Circuit Judges.

GREGG COSTA, Circuit Judge:

Gated toll booths are becoming a thing of the past. Their reign had one big advantage: drivers could not pass through the gate without paying. But they also caused traffic backups as drivers scrounged their vehicles for quarters, handed them over to an attendant or tossed them into a bucket, and then waited for the gate to lift after the payment registered.

The North Texas Tollway Authority has been a trendsetter in the move away from gated booths. It created the first system in the country that allowed drivers without either change in their pockets or TollTags (sometimes called

No. 16-10767

EZTAGs) affixed to their windshields to still use toll roads.  Of course, those drivers are supposed to pay their share at some point, so the Authority used cameras to take pictures of the vehicles' license plates and mailed a bill to the owners.  If the drivers did not pay the tolls within 35 days of the invoice, administrative fees started to accrue.  The fees increased to $25 per violation once the Authority sent a third bill to the driver.  The Plaintiffs in this case, who were assessed fees totaling hundreds and in some cases thousands of dollars after they repeatedly refused to pay tolls, contend that the $25 administrative fee violates their right to substantive due process under the Fourteenth Amendment.   The district court held that the fee is not unconstitutional.  We agree.

## I.

The North Texas Tollway Authority is a regional agency established to administer toll roads in north Texas.  *See* TEX. TRANSP. CODE ANN. § 366.032. Among other roads in the Dallas-Fort Worth metroplex, it oversees the Dallas North Tollway, President George Bush Turnpike, Sam Rayburn Tollway, and Chisholm Trail Parkway. When it was established in 1997, all toll booths were manned and gated, and drivers paid tolls either in cash or using a TollTag.  A TollTag is a transponder attached to a vehicle that is linked to a driver's account funded in advance.  Each time the driver travels through a toll point, the toll is deducted from the account.  Under the old system, the only way for a driver to jump the toll was to tailgate behind another vehicle that had paid. If caught, the offender was charged a $10 administrative fee along with the unpaid toll.  The authority to collect these fees comes from section 366.178 of the Regional Tollway Authority Act.   TEX. TRANSP. CODE ANN. § 366.178(c)

2

No. 16-10767

(2009) ("[A]n authority may charge an administrative fee of no more than $100 to recover the cost of collecting the unpaid toll.").[1]

In 2000, hoping to ease congestion at toll plazas, the Authority opened TollTag-Only lanes, stopped manning all toll booths on a 24-hour basis, and removed gates from booths. Although these changes were expected to help with traffic, they would also make it easier for free riders to shirk tolls. Drivers no longer had to contend with gates or guards; they could simply drive through the unguarded, ungated booths of the TollTag-only lanes and hope they were not discovered. In a bid to keep drivers honest, the Authority installed high-speed cameras above these lanes, which could photograph drivers who refused to pay. A bill was then sent requesting payment of the toll plus an administrative fee. The Authority determined that the old $10 administrative fee was insufficient to cover costs incurred in installing new cameras and the increase in drivers who would refuse to pay. The Authority ultimately decided to increase the administrative fee to $25, though Plaintiffs allege this decision was made without deliberation.

The Authority then began moving to a system—the one challenged in this case—that went one step further in reducing traffic congestion. All booths were removed. TollTags were the only way to pay at the time the road was being used. But rather than restrict usage to those with TollTags, the Authority created a ZipCash system that opened access to all drivers. For cars without a TollTag, the camera would capture the license plate. After a sufficient number of tolls were incurred, the Authority would send an invoice for the unpaid tolls. Unlike the bills for those who violated the rules of "TollTag

---

[1] After the time relevant here, section 366.178 was amended to reduce the cap on administrative fees. Now, the Authority can charge only one administrative fee of not more than $25. TEX. TRANSP. CODE ANN.§ 366.178(c) (2015).

No. 16-10767

only lanes," no administrative fee was included in this initial bill. The Authority did, however, charge a 50% higher toll for those paying under ZipCash compared to those paying with TollTags. This premium was meant to cover the risk that many would not pay.

For those who did not pay within 35 days of the invoice issuing, administrative fees were imposed. The fees escalated if the second bill was ignored as the following table reveals:

| Invoice | Due Date | Administrative Fees |
|---------|----------|---------------------|
| Original Invoice | 35 Days from Invoice | $0 |
| Late Notice | 15 Days from Notice | $1.50 or $2.50 per toll |
| Violation Invoice | 30 Days from Invoice | $25 per toll |

Even when the third bill imposed the $25 fee, the Authority offered ways to get out of paying that amount. Paying the toll within 30 days of the violation invoice, or opening a TollTag account during that time, dropped the administrative fee by 2/3 to $8.33 a toll. During some promotional periods, the Authority would drop all administrative fees if the violator opened a TollTag account. The Authority also had customer service representatives available for drivers to contact about their administrative fees, and these representatives had the discretion to reduce or excuse fees. If the customer still refused to pay, their invoice was sent to a collections agency. If the agency was unsuccessful, the customer's account could be forwarded to the Texas Department of Public Safety for issuance of a criminal citation.

No. 16-10767

As expected, the cashless system led to more drivers using the toll roads. Also as expected, many of them never paid after receiving the bill. This left the Authority on the hook for tens of millions of dollars in unpaid tolls. The fees imposed for those unpaid tolls exceed $1 billion. Among those unpaid tolls and fees are amounts owed by the Plaintiffs. Mirna Reyes, for example, used toll roads 153 times without timely paying, accruing $139.25 in unpaid tolls and $3,825 in unpaid administrative fees. Emmanuel Lewis racked up $387.80 in unpaid tolls and $10,050 in administrative fees.

The drivers filed this suit alleging a violation of numerous rights, but they ended up asserting just a claim under substantive due process. They contend that the $25 administrative fee is so much higher than the cost of collecting an unpaid toll that it violates the due process rights of drivers who incur them. For that assertion, they rely on analysis a contractor hired by the Authority performed after the fees came under public scrutiny. He concluded that the marginal cost of collecting an individual toll is $0.94.

During this litigation, an expert hired by the Authority conducted a different inquiry: not how much it costs to collect a single toll, but a comparison of the total amount spent trying to collect tolls versus the fees actually collected. Under that approach, the fees collected ($41,677,514)[2] do not cover costs ($52,014,271).[3]

---

[2] The collection rate is low. The Authority charged $1.38 billion in administrative fees during the relevant time period. As noted above, the gap between that number and what was collected is not just a matter of uncooperative drivers. There are a number of ways to have the fees reduced or removed.

[3] The drivers also hired an expert, who relied on a cost-per-transaction method in arriving at a different number. But the Authority's expert noted that the drivers' expert focused only on instances when fees outweighed costs to arrive at his number. Applying the drivers' cost-per-transaction method to all relevant invoices results in a cost estimate that is actually higher than the one reached by the Authority's expert. The drivers do not contest this recalculation, and thus fall back on the pre-suit $0.94 figure.

5

No. 16-10767

Relying in part on this calculation, the district court held that there was a rational relationship between the $25 administrative fee and the Authority's interest in recovering costs spent to collect unpaid tolls. The court also cited another interest—using high fees to encourage drivers to switch to the more efficient TollTag system—that allowed the fees to withstand Fourteenth Amendment scrutiny.

## II.

In rejecting the substantive due process challenge, the district court applied rational basis review. The drivers urge us to apply that standard, though they disagree with the court's application of it. That level of scrutiny, which is the default for substantive due process claims that do not implicate a fundamental right, requires that the administrative fees be rationally related to a legitimate government interest. *FM Props. Operating Co. v. City of Austin*, 93 F.3d 167, 174 (5th Cir. 1996). Rational basis is a notoriously deferential standard, but the Authority argues that the drivers should face what it views as an even more daunting burden: having to show that the fee "shocks the conscience."[4] Under that test, the drivers would have to show that the fee scheme was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Conroe Creosoting Co. v. Montgomery Cty.*, 249 F.3d 337, 341 (5th Cir. 2001); *see also County of Sacramento v. Lewis*, 523 U.S. 833, 847–54 (1998).

---

[4] Though the parties seem to think so, it is not apparent that the rational basis standard is always a "lower" threshold for plaintiffs to meet. Consider a hypothetical based on the type of fee this case presents. An astronomically high administrative fee, say $10,000 per violation, would be a potent incentive for drivers to convert to TollTags, thus furthering a legitimate governmental interest. But there would be a compelling case that the amount shocks the conscience.

No. 16-10767

We have applied both tests in substantive due process cases. *Compare FM Props. Operating Co.*, 93 F.3d at 173–75 (applying rational basis review to a due process challenge to the application of a city's zoning ordinance), *and Mikeska v. City of Galveston*, 451 F.3d 376, 379–81 (5th Cir. 2006) (applying rational basis review to a city's refusal to reconnect utilities to a number of homes allegedly condemned under state law), *with Cripps v. La. Dep't of Agric. and Forestry*, 819 F.3d 221, 232–33 (5th Cir. 2016) (applying shocks the conscience to a state commission's decision to deny a professional license to the plaintiff), *and Giles v. Shaw Sch. Dist.*, 655 F. App'x 998, 1004 (5th Cir. 2016) (applying shocks the conscience to School Board's decision not to renew principal's employment). Although we have not always been transparent as to why we land on one test over the other, we have generally been consistent: government action that applies broadly gets rational basis; government action that is individualized to one or a few plaintiffs gets shocks the conscience. This is in sync with the many circuits that expressly apply rational basis to legislative or quasi-legislative action (government action that applies broadly) and shocks the conscience to executive action (government acts that are more individualized). *See DePoutot v. Raffaelly*, 424 F.3d 112, 118 (1st Cir. 2005); *Nicholas v. Pa. State Univ.*, 227 F.3d 133, 139 (3rd Cir. 2000) (Alito, J.); *Hawkins v. Freeman*, 195 F.3d 732, 738 (4th Cir. 1999); *Putnam v. Keller*, 332 F.3d 541, 547 (8th Cir. 2003); *McKinney v. Pate,* 20 F.3d 1550, 1557 n. 9 (11th Cir. 1994).

This legislative/executive dichotomy comports with the Supreme Court's use of the "shocks the conscience" test. Its most prominent recent application of the test considered the actions of a police officer during the high-speed pursuit of a suspect. *Lewis*, 523 U.S. at 854–55. *Lewis* explained that although both legislative and executive action must comply with due process, "criteria

7

to identify what is fatally arbitrary differ depending on whether it is legislation or a specific act of a governmental officer that is at issue." *Id.* at 846. "[T]he substantive component of the Due Process Clause is violated by *executive* action only when it 'can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense.'" *Id.* at 847 (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 127 (1992)) (emphasis added); *id.* at 846 ("[F]or half a century now we have spoken of the cognizable level of executive abuse of power as that which shocks the conscience."). That is also consistent with the case in which Justice Frankfurter articulated the standard, *Rochin v. California*, 342 U.S. 165, 171 (1952). *Lewis*, at 849 n.9 (noting *Rochin* "formulated and first applied" the "shocks the conscience" standard for due process claims). *Rochin* addressed police forcibly pumping a suspect's stomach in an attempt to obtain evidence. 342 U.S. at 166; *see also Collins*, 503 U.S. at 127 (applying, but not finding, shocks the conscience to the death of a city sanitation worker that was allegedly caused by the city's failure to properly train its employees in safety procedures).

The Authority's administrative fees are not this type of government conduct directed at a particular individual. The challenged fees are unlike the actions of particular officer in *Rochin* or *Lewis*, a commission's decision to deny an individual a professional license, *Cripps*, 819 F.3d at 232, or a School Board's decision not to renew a principal's employment, *Giles*, 655 F. App'x at 1004. Some due process challenges blur along the executive/legislative line, such as when a broadly applicable rule is challenged only as it applies to a particular situation. *See Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 867–69 (5th Cir. 2012) (en banc) (applying shocks the conscience—in a situation similar to *Collins v. City of Harker Heights*—when a broadly applicable policy was challenged based on how it harmed a particular

individual).  In contrast, the challenge here easily fits into the legislative box. The fees are broadly imposed; any driver who uses the toll roads and shirks payment is subject to them.  As the more than $1 billion in uncollected fees indicates, there are usually hundreds of such people every day.  The lawsuit seeks to invalidate the fees across the board, not just a particular application of the fees that had an egregious impact.  Rational basis review applies.

The interest the government asserts to show rationality need not be the actual or proven interest, as long as there is a connection between the policy and a "conceivable" interest.  *FM Props.*, 93 F.3d at 175.  The Authority gives two reasons for the $25 administrative fee: (1) it recovers some of the costs associated with collecting unpaid tolls, and (2) it encourages ZipCash customers to switch to TollTags.

The drivers concede that the recovery of collection costs is a legitimate interest.  *See Broussard v. Parish of New Orleans*, 318 F.3d 644, 656–57 (5th Cir. 2003).  They argue, however, that the $25 fee is so far above the cost of collection that it is not rationally related to recovering costs.  This argument faces a high hurdle because if the relationship "is at least debatable, there is no substantive due process violation."  *Simi Inv. Co. v. Harris Cty., Tex.,* 236 F.3d 240, 251 (5th Cir. 2000).  In an attempt to show a lack of any conceivable connection, the drivers emphasize the disparity between the $25 fee and the presuit study indicating that the cost of collecting an unpaid toll is only $0.94.  But there are problems with the $0.94 figure the drivers quote.  That calculation did not include overhead associated with the new system—including camera installation and image processing—and appears to have assumed that all unpaid tolls would be collected.

The drivers' argument thus ignores the amount the Authority actually collected.  Far from a massive windfall, the Authority has only recovered

9

around $42 million in administrative fees, which is about $10 million less than what it spent to collect that amount. The drivers blame the Authority's inability to recoup collection costs on its voluntary waiver and abandonment of over $900 million in administrative fees. But waiver often encouraged customers to switch to the TollTag system, which all these problems with toll collection show has the potential to save the Authority a lot of money in the long run.[5]

The parties thus offer different methods for evaluating the connection between the fee amounts and recovering administrative costs: the drivers focus on the estimated marginal case of collecting a single toll; the Authority focuses on the overall impact of collection efforts on its bottom line. In the deferential world of rational basis review, it is enough that the Authority can point to one reasonable way of looking at the question that justifies the fee.

The drivers argue that their calculation is nonetheless required by the state statute authorizing the fees and that the district court erred in saying the state law is "not relevant" to the due process inquiry. On the latter point, that phrasing may be the one imprecision in the district court's thorough and well-reasoned opinion. Violating a state statute can be evidence that a government action is not rationally related to a legitimate government interest. *See Stern v. Tarrant Cty. Hosp. Dist.*, 778 F.2d 1052, 1060 (5th Cir. 1985) (en banc) ("[T]he Texas Medical Practice Act is relevant to . . . the question of whether there was a rational basis for [the state's action]."). That

---

[5] The drivers also challenge the waiver of the fees as arbitrary. They describe a system in which fees are waived for some lucky customers, but not others. The evidence is to the contrary. In fact, most of the plaintiffs were offered waivers of at least some of their fees in exchange for either paying unpaid tolls or switching to TollTag. The waivers, like the administrative fees themselves, were linked to the Authority's interest in recovering or reducing costs associated with unpaid toll collection.

No. 16-10767

does not get the drivers very far, however, as violation of a statute is not enough on its own to render action an unconstitutional. *Id.* at 1059 ("[V]iolation of state law is neither a necessary nor a sufficient condition for a finding of a due process violation."). The drivers contend the statute requires a close connection between the fee and costs because it says "an authority may charge an administrative fee of no more than $100 *to recover* the cost of collecting the unpaid toll." TEX. TRANSP. CODE ANN. § 366.178(c) (2009) (emphasis added). Assuming that language requires some such connection,[6] we do not see why it mandates the marginal cost analysis the drivers prefer. And even if the fee does violate the "to recover" clause in the state law, that alone would not violate due process given the strong relationship the fee bears to collecting costs that the Authority has not fully recovered. Using the statute alone to establish irrationality is also undercut by the $100 cap it then placed on each administrative fee. How does the state law demonstrate that a $25 fee is irrational when it contemplated a fee four times that amount?

It is telling that the drivers cite no case, nor could we find one, holding that a fee bearing any resemblance to this one violates substantive due process.[7] If we were to so hold for the first time, we would have to answer a

---

[6] The Authority's view is that this language only explains the purpose of the administrative fees, without requiring the Authority to align the fee rate with the amount needed to collect the fees. In support it contrasts the fee statute with other Texas laws that make explicit the need for an authority to keep fees and cost closely connected. *See, e.g.*, TEX. PROP. CODE ANN. § 203.004(a) ("The amount of the fee may not exceed the administrative costs to be incurred by the county in pursuing the matter.").

[7] The cases the drivers cite do not involve fees. The lot-clearing ordinance in *Berger v. City of Mayfield Heights* was struck down because it had almost nothing to do with the city's stated interest in public health and safety. 154 F.3d 621, 625 (6th Cir. 1998). *Mikeska v. City of Galveston* vacated summary judgment in favor of the city because there was "nothing in the record" to establish any connection between the city's refusal to reconnect utility services and its stated interest. 451 F.3d 376, 381 (5th Cir. 2006). For the Authority's fee, the record amply demonstrates a connection with two legitimate interests.

number of questions. Should the Authority have to conduct a study estimating costs and collection rates before implementing the system?[8] How close to the Authority's costs would the fees collected have to come? How often would the Authority have to perform the calculation and reassess the fee it charged? The drivers do not suggest answers to most of these questions. The Due Process Clause does not seem the place to find them.

What we have said about the interest in recovering collection costs is enough to uphold the fees, but the Authority's second justification for the $25 fee also suffices. Recall that the fee is reduced by 2/3 if the violator opens a TollTag account, and during some promotions the entire fee is erased. The fee, with its avenues for avoidance, is thus a mechanism that strongly encourages drivers to get a TollTag. The drivers challenge this rationale primarily on the ground that incentivizing drivers to switch to TollTags is not a legitimate interest. Part of this argument comes from the state statute we have discussed that the drivers view as limiting the fees to recovery of administrative costs. As a violation of a statute is only evidence helping to show irrationality, it alone cannot render the fee unconstitutional when there is a strong interest in encouraging the more efficient TollTag method of payment.

The drivers suggest more generally that the Authority should not be able to "force" them into the TollTag system through administrative fees. But no one is being forced to use the toll roads or any particular payment system. In a pre-ZipCash world, drivers without TollTags or change in their car could not

---

[8] For its part, the Authority asserts that rational speculation of costs is sufficient to pass rational basis review even if "unsupported by evidence or empirical data." *F.C.C. v. Beach Comms., Inc.*, 508 U.S. 307, 315 (1993) (applying rational basis review to congressional legislation). At its meeting approving the rate increase, the Authority's board speculated that the administrative fees rate did not "generate monies in excess of that necessary to recover the cost of collection." That is enough under the "low threshold" of rational basis. *Simi Inv.*, 236 F.3d at 251.

No. 16-10767

use the toll roads.  Now they can. They just have to pay like everyone else, but are given the convenience of paying after usage.  They can continue to pay with ZipCash rather than a TollTag and will avoid any fees if they timely do so.

The driver's also miss the nature of the Authority's interest in incentivizing TollTag usage.  It is not to prop up the transponder industry. Instead, the more drivers use TollTags, the fewer tolls there are to collect, and the more tolls end up getting paid.  As with the other asserted interest, this one comes down to sustaining the Authority's financial health.  *See Broussard*, 318 F.3d at 656.   The fee passes rational basis review.[9]

\* \* \*

The ZipCash system with its challenged fees is the type of novel policymaking for which the limited scrutiny of rational basis review is most justified.  *Cf. New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandies, J., dissenting).  The Authority's experiment sought to decrease congestion and increase access to the roads, two interests that often compete but could both be furthered by removing toll booths.  There are usually imperfections in new policies.  The amount of the fee may have been one. Indeed, public disapproval with the fees led to passage of a new state law limiting the amount of administrative fees the Authority could levy (notably to the $25 challenged here).  The political process may continue to fine tune toll collection, but that is not the Due Process Clause's role to play.

The judgment of the district court is AFFIRMED.

---

[9] The failure of the due process claim also dooms the drivers' claims for declaratory and injunctive relief.  These claims are not freestanding; they must be supported by some underlying cause of action.  *Harris County Texas v. MERSCORP, Inc.*, 791 F.3d 545, 552 (5th Cir. 2015) ("[T]he Declaratory Judgment Act alone does not create a federal cause of action."); *Crook v. Galaviz*, 616 F. App'x 747, 753 (5th Cir. 2015) ("As an injunction is a remedy that must be supported by an underlying cause of action, the failure of [ ] constitutional and common law claims also warrants the dismissal of [a] claim.").