# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

April 11, 2023

Lyle W. Cayce
Clerk

No. 21-51039

Carolyn Smith, as Trustee of the Smith Family Living Trust; Lirtex Properties, L.L.C.,

*Plaintiffs—Appellants*,

*versus*

The City of Bastrop; Connie Schroeder, in her official capacity as a member of the City Council of the City of Bastrop, Texas; Willie "Bill" Lewis Peterson, in his official capacity as a member of the City Council of the City of Bastrop, Texas; Drusilla Rogers, in her official capacity as a Director of Hunters Crossing Local Government Corporation; Lyle Nelson, in his official capacity as a member of the City Council of the City of Bastrop, Texas; Bill Ennis, in his official capacity as a member of the City Council of the City of Bastrop, Texas; Dock Jackson, in his official capacity as a member of the City Council of the City of Bastrop, Texas; Lynda Humble, in her official capacity as a Director of Hunters Crossing Local Government Corporation; Drusilla Rogers, in her official capacity as a member of the City Council of the City of Bastrop, Texas; Rick Womble, in his official capacity as a Director of Hunters Crossing Local Government Corporation; Michelle Dodson, in her official capacity as a Director of Hunters Crossing Local Government Corporation; Lyle Nelson, in his official

CAPACITY AS A DIRECTOR OF HUNTERS CROSSING LOCAL GOVERNMENT CORPORATION; TABITHA PUCEK, IN HER OFFICIAL CAPACITY AS A DIRECTOR OF HUNTERS CROSSING LOCAL GOVERNMENT CORPORATION; TF HUNTERS CROSSING, L.P., AS SUCCESSOR-IN-INTEREST TO FORESTAR (USA) REAL ESTATE GROUP, INC.,

*Defendants—Appellees.*

---

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:19-CV-1054

---

Before RICHMAN, *Chief Judge*, and HO and ENGELHARDT, *Circuit Judges*.

PER CURIAM:*

Plaintiffs-Appellants Carolyn Smith, as Trustee of the Smith Family Living Trust, and Lirtex Properties, L.L.C. (collectively, "Plaintiffs-Appellants), challenge the district court's dismissal of the claims that they have asserted under the United States and Texas Constitutions relative to City of Bastrop Ordinance No. 2019-40. For the reasons stated herein, the district court's judgment of dismissal is AFFIRMED IN PART and VACATED and REMANDED IN PART. Specifically, we affirm the dismissal of Plaintiffs-Appellants' federal procedural and substantive due process claims but, because the basis for the district court's dismissal of Plaintiffs-Appellants' Texas law claims is not sufficiently clear to enable proper appellate review, we vacate and remand relative to those claims.

---

* This opinion is not designated for publication. *See* 5TH CIRCUIT RULE 47.5.

No. 21-51039

## I.

City of Bastrop Ordinance No. 2019-40 (the "2019 Ordinance") was enacted on September 24, 2019, by the City Council of the City of Bastrop, Texas, pursuant to the Texas Public Improvement District Assessment Act ("PIDA Act"), Tex. Loc. Gov't Code § 372.001, *et seq.* The Texas PIDA Act permits municipalities and counties to undertake and finance public improvement projects in definable parts of the municipality or county by levying special financial assessments upon the property within the definable area specially benefited by the improvement. The legislation thus makes public improvements possible that otherwise might not be if the entirety of the municipality's taxpaying citizenry, rather than only the owners of property specially benefited by them, had to bear their costs. Various types of improvements are permitted, including constructing or improving streets and sidewalks, providing water, wastewater, and drainage facilities, and constructing or improving off-street parking, landscaping, lighting and signs. *See* Tex. Loc. Gov't Code § 372.003.

The public improvement project that is the focus of the 2019 Ordinance involved the creation and/or provision of public streets, water distribution lines and facilities, storm sewer lines and facilities, public area landscaping, a public park and hike/bike trail, and area signage, as well as public area property maintenance, on a previously unimproved 283.001-acre parcel of land on which various residences and commercial buildings were to be built. The project commenced with the filing of a petition, as required by § 372.003, on July 18, 2001. And, on September 11, 2001, City of Bastrop Resolution No. R-2001-19 established the "Hunters Crossing Public Improvement District" (hereinafter, the "Hunters Crossing PID").

After notices were published and a public hearing held, the City of Bastrop City Council passed and approved Resolution No. R-2003-34 on November 11, 2003, and Ordinance No. 2003-35 (hereinafter, the "2003

3

No. 21-51039

Ordinance") on December 9, 2003.[1] Exhibit B to the 2003 Ordinance is the Hunters Crossing PID "Service and Assessment Plan" (hereinafter, the "2003 SAP"), which was prepared on November 19, 2003. In 2004, another ordinance (the "2004 Ordinance") involving the Hunters Crossing PID was passed and approved. The 2004 Ordinance included a "Revised Capital Assessment Roll" correcting minor mathematical and scrivener errors in the "2003 Assessment Roll" that is part of the 2003 SAP.

In 2005, the original developer of the Hunters Crossing PID broke ground on the improvement project. By mid-July 2011, a majority of the capital improvements projects in the Hunters Crossing PID had been completed.

In 2017 and 2018, the Bastrop City Council conducted annual reviews of the 2003 SAP, and passed and approved additional ordinances involving the Hunters Crossing PID. Although both the 2017 and 2018 Ordinances included an "Assessment Roll" for the next fiscal year, the City Council did not amend the 2003 SAP in either year.

In September 2019, however, the City Council passed and approved the 2019 Ordinance, along with the 2019 "Amended and Restated Service and Assessment Plan" (hereinafter, "the 2019 SAP"),[2] which includes the "2019 Assessment Roll." Notably, unlike the 2003 and 2004 Assessment Rolls, the 2019 Assessment Roll lists all of the commercial, multifamily, and single-family lots in the Hunters Crossing PID—each identified by property identification number—that the developer had subdivided and sold since the

---

[1] Certain documents in the record also refer to the 2003 Ordinance as the "Original Assessment Ordinance."

[2] The 2019 SAP, which is Exhibit A to the 2019 Ordinance, replaces the 2003 SAP.

No. 21-51039

2003 Ordinance and 2003 SAP were approved.[3] The 2019 Ordinance documents reveal that 510 single-family lots were created, whereas the 2003 Ordinance and SAP had contemplated 464 single-family lots. The number of planned versus actually-developed commercial and multifamily lots likewise differ.

The 2003 Ordinance and SAP and the 2019 Ordinance and SAP also set forth different time periods over which the Hunters Crossing PID capital assessments are amortized and payable in annual installments. The 2003 documents contemplate payments over 25 years; the 2019 documents extend that time until January 2034 for commercial assessments, until January 2041 for multi-family and undeveloped lot assessments, and until January 2030 for single-family residential assessments. Finally, although the total capital assessment is $11,961,260 in the 2003 Ordinance and SAP, as well as in the 2019 Ordinance and SAP, the 2019 documentation reveals that the entirety of that amount is capital costs (exclusive of interest) incurred in constructing the planned public improvements,[4] whereas the 2003 documents indicate that sum includes $7,475,787 of estimated capital costs (exclusive of interest) and $4,485,473 of estimated capitalized interest.

Following the September 24, 2019 adoption of the 2019 Ordinance and 2019 SAP, two Hunters Crossing PID property owners—Plaintiffs-

---

[3] The 2003 and 2004 Assessment Rolls did not provide that information because, as of those dates, the property was not yet subdivided into, and sold as, individual lots. Thus, the 2003 and 2004 documents identify larger tracts of land described as including varying numbers of individual lots to be sold by the developer during the course of the project. And the Fiscal Year 2018 and Fiscal Year 2019 Assessment Rolls reflect ten tracts of land (encompassing varying amounts of single-family home lots), rather than the eight tracts identified for single-family lots in the 2003 and 2004 documentation.

[4] Unless otherwise indicated, "capital costs" refers to construction costs, (including land costs and various professional fees) for the Hunters Crossing PID public improvements.

No. 21-51039

Appellants Smith and Lirtex—filed this suit, on October 28, 2019, against the City of Bastrop and various city officials (collectively, the "City Defendants), as well as the Hunters Crossing PID property developer, Forestar (USA) Real Estate Group, Inc. ("Forestar"), and its successor-in-interest, TF Hunters Crossing, LP ("TF"). Plaintiffs-Appellants seek (i) a declaration that the 2019 Ordinance violates the substantive and procedural due process protections provided by the United States Constitution and thus is invalid; (ii) a declaration that the 2019 Ordinance violates the Texas Constitution's prohibition against retroactive lawmaking; (iii) a declaration that the City Defendants have acted *ultra vires* in seeking to enforce the 2019 Ordinance; (iv) a permanent injunction against enforcement of the 2019 Ordinance; and (v) an award of reasonable and necessary attorneys' fees under 42 U.S.C. § 1988.

Challenging various aspects of the 2019 Ordinance, Plaintiffs-Appellants aver that, by 2019, the City of Bastrop was legally prohibited from assessing any capital costs that the developer had incurred in excess of the $7,475,787 estimated in the 2003 Ordinance and SAP because (i) the 2003 Ordinance only permitted the City to legally levy $7,475,787 for capital costs, and (ii) the City Council had not timely reviewed and updated the 2003 SAP to account for any "cost overruns" — i.e., capital costs (exclusive of interest) that the developer had incurred in excess of the $7,475,787 estimated in the 2003 Ordinance and SAP.

The district court denied a motion to dismiss filed by the City Defendants, denied a motion for partial summary judgment filed by Plaintiffs-Appellants, and granted in part and denied in part a motion for summary judgment filed by the City Defendants. In granting the City Defendants' motion in part, the district judge rejected Plaintiffs-Appellants' assertions that (1) the PIDA Act prevented the City of Bastrop from including a particular type of interest in the original 2003 Ordinance; and (2) the 2019

6

No. 21-51039

Ordinance deprived property owners of the right to immediately pay off the entirety of their individual assessments. More specifically, the district court reasoned that the PIDA Act "contains no provision prohibiting municipal governments from including interest in an assessment" and, even if immediate payoff was not available prior to 2019, there is no evidence demonstrating that the 2019 Ordinance—the ordinance in question—precluded immediate payoff.[5] In denying the City Defendants' summary judgment motion in part, the district court decided that (1) Plaintiffs-Appellants have constitutionally-protected property interests "aris[ing] from the PIDA Act" and (2) disputed fact issues prevented granting the motion in its entirety.[6]

On May 17–18, 2021, a bench trial was held on the remaining issues; thereafter, the parties submitted post-trial briefs. On September 29, 2021, the district court entered an order setting forth written findings of fact and conclusions of law. Though acknowledging the City of Bastrop's various administrative shortcomings in the interim years between passing and approving the 2003 Ordinance and passing and approving the 2019 Ordinance, the district court rejected the federal due process challenges to the 2019 Ordinance and rendered judgment in the defendants' favor. Concluding that Plaintiffs-Appellants had failed to carry their evidentiary burden of proof, the district court explained, in pertinent part:

> As an initial matter, until 2019, Defendants did not exercise due diligence in properly and transparently administering the Hunters Crossing PID. Plaintiffs Smith and Liriano

---

[5] The district judge adopted the magistrate judge's recommendation regarding this determination.

[6] The district judge also adopted the magistrate judge's recommendations regarding these issues.

[Lirtex's representative] testified that they did not have access to accurate information about the PID before purchasing their properties or in the years after. The City of Bastrop repeatedly provided inaccurate information to property owners. This is bolstered by testimony from representatives of the City of Bastrop and Hunters Crossing that the PID was poorly administered and that they were unaware of how the PID was being administered or the legal parameters of the PID before 2019. This should have been corrected sooner. However, as to this action, Plaintiffs have not met their burden of proving that the 2019 Ordinance was unlawful.

The outcome of this case turns on whether Defendants increased the total amount due on the PID in the 2019 Ordinance. The Court concludes that the 2003 Ordinance and SAP levied a total of [approximately] $11.962 million collectively on the properties, without specifically apportioning this among individual properties or limiting a portion of this total to interest. The 2003 Ordinance did not finally apportion the Capital Assessment levied in lump sum on the approximately 283 acres of property in the Hunters Crossing PID because the property had not been developed. Not until the 2019 Ordinance was there an apportionment of the Capital Assessment levied in lump sum by the 2003 Ordinance. The 2019 Ordinance confirmed actual costs of PID Capital Improvements, credited past payments made towards the Capital Assessment on a parcel-by-parcel basis, provided for the owner's option to either pay in lump sum or pay in annual installments the Capital Assessments on a parcel-by-parcel basis, and made findings of special benefits received by properties on a parcel-by-parcel basis based on the actual costs of the PID Capital Improvements and the classified land-use as measured by a square-foot or per-lot basis. As such, the 2019 Ordinance did not increase the amount of the Capital Assessment levied in lump sum on the 283 acres in the PID in the amount of approximately $11.962 million. The 2019 Ordinance accurately credited property owners for the payments that they had previously made towards the PID.

No. 21-51039

Plaintiffs did not meet their burden to show that the extended time period for property owners to make payments, beyond 2028, increased the amount of the PID's capital assessment due by each of the Plaintiffs.

Further, the 2019 Ordinance did not include interest in the $11.962 million total that was apportioned. Because interest was not included, the Court concludes that interest was not improperly calculated in the 2019 Ordinance.

\* \* \*

[The] PIDA [Act] grants governing bodies discretion in adjusting assessments, but places significant restrictions on that discretion by mandating the process required for adjustment, thus creating a property interest for individuals within the PID. Tex. Local Gov't Code §§ 372.013, 372.014, 372.015, 372.017, 372.018.

[The] PIDA [Act] states that the service plan must be reviewed and updated annually "for the purpose of determining the annual budget for improvements." Tex. Local Gov't Code § 372.013(b). [The City defendants] did not conduct these annual reviews until 2019. However, because the Court finds that the total amount levied under the 2003 Ordinance was $11.9 million, the Court concludes that there was no increase under the 2019 Ordinance and therefore there are no actionable substantive due or procedural due process violations. Additionally, for the same reasons, the Court concludes that none of the Defendants have acted ultra vires or engaged in a civil conspiracy, and Hunters Crossing is not liable for negligent misrepresentation.

Although the district court did not expressly address Plaintiffs-Appellants' claims asserted under the Texas Constitution in its findings and conclusions, it "order[ed] that judgment be entered in favor of Defendants." A "Final Judgment" awarding judgment "in favor of the Defendants," and ordering

9

that "all relief not specifically granted is denied," was entered the same day. This appeal followed.

## II.

An appellate court reviews a district court's grant of summary judgment de novo, "applying the same standard as the district court." *Moon v. City of El Paso*, 906 F.3d 352, 357 (5th Cir. 2018). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Kitchen v. BASF*, 952 F.3d 247, 252 (5th Cir. 2020). A party asserting that there is a genuine dispute as to any material fact must support its assertion by citing to particular parts of materials in the record. *See* FED. R. CIV. P. 56(c)(1)(A).

Following a bench trial, appellate courts "review the district court's findings of fact for clear error, and conclusions of law and mixed questions of law and fact de novo." *French v. Allstate Indem. Co.*, 637 F.3d 571, 577 (5th Cir. 2011) (internal citation omitted). "A finding is clearly erroneous if it is without substantial evidence to support it, the court misinterpreted the effect of the evidence, or th[e] court is convinced that the findings are against the preponderance of credible testimony." *Bd. of Trs. New Orleans Emp. Int'l Longshoremen's Ass'n v. Gabriel, Roder, Smith & Co.*, 529 F.3d 506, 509 (5th Cir. 2008). A district court's interpretation of a statute or ordinance is reviewed de novo. *Rothe Dev. v. United States DOD*, 666 F.3d 336, 338 (5th Cir. 2011).

We may affirm on any basis supported by the record even if it differs from that on which the district court relied. Although cited most often in the summary judgment context, this rule applies regardless of whether judgment has been rendered on summary judgment motions or follows a bench trial. *In*

No. 21-51039

*re Deepwater Horizon,* 48 F.4th 378, 385 (5th Cir. 2022) (summary judgment); *Amerisure Mut. Ins. Co. v. Arch Specialty Ins. Co.*, 784 F.3d 270, 273 (5th Cir. 2015) (summary judgment); *Meche v. Doucet*, 777 F.3d 237, 244 (5th Cir. 2015) (bench trial); *see also West African Ventures Ltd. v. SunTx Cap. Partners II GP, L.P.*, 841 F. App'x 705, 706 (5th Cir. 2021) (unpub.) (per curiam) (bench trial); *Hearn v. McCraw*, 856 F. App'x 493, 495 (5th Cir. 2021) (unpub.) (per curiam) (bench trial), *cert. denied sub nom. Hearn v. McCraw*, 142 S. Ct. 754 (2022). Notably, the matter is one within our discretion as a court of review; thus, we are not required to "sift through the record for potential reasons to affirm that were not addressed by the district court." *Bank of Am., N.A. v. Estrada,* No. 22-50039, 2022 WL 2826447, at *3 (5th Cir. July 19, 2022) (summary calendar) (unpub.) (per curiam) (citing *Rutila v. Dep't of Transp.,* 12 F.4th 509, 511 (5th Cir. 2021)).

## III.

On appeal, Plaintiffs-Appellants contend that the district court erred in rejecting their assertions that the 2019 Ordinance violates the due process protections provided by the Fourteenth Amendment to the United States Constitution.

## A.

The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. CONST. AMEND. XIV § 1.[7] The Fourteenth Amendment's due process clause provides both procedural and substantive protections. Although federal procedural due process

---

[7] Appellants' federal due process claims are asserted under 42 U.S.C. § 1983. Section 1983 itself is not an origin of substantive rights, but instead acts as a vehicle for enforcing federal rights secured by the United States Constitution and other federal law. *Albright v. Oliver,* 510 U.S. 266, 271 (1994).

protections do not preclude governmental deprivations of life, liberty, or property, they do require that such deprivations include certain procedural safeguards. *See Bd. of Regents v. Roth,* 408 U.S. 564, 576 (1972). Substantive due process protections, in contrast, "bar[] certain government actions regardless of the fairness of the procedures used to implement them." *Daniels v. Williams*, 474 U.S. 327, 331 (1986); *Franklin v. United States,* 49 F.4th 429, 435 (5th Cir. 2022).

Plaintiffs-Appellants maintain that the 2019 Ordinance deprives them of property interests in violation of their federal procedural and substantive due process protections. The property interests protected by federal due process "are not created by the [United States] Constitution." *Roth,* 408 U.S. at 577. "Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law[.]" *Id.*; *see also Schaper v. City of Huntsville*, 813 F.2d 709, 714 (5th Cir. 1987) ("Once a state confers a property right, it cannot constitutionally deprive such an interest without procedural safeguards."). Whether a *state*-created property interest "rises to the level" of a constitutionally-protected interest, however, is determined by *federal* constitutional law. *Town of Castle Rock v. Gonzales,* 545 U.S. 748, 757 (2005); *Wigginton v. Jones*, 964 F.3d 329, 336 (5th Cir. 2020), *cert. denied sub nom. Wigginton v. Univ. of Mississippi*, 141 S. Ct. 1268 (2021). Even so, "[r]esolution of the federal issue [] begins with a determination of what it is that state law provides." *Castle Rock,* 545 U.S. at 757. And, though protected property interests "extend well beyond actual ownership of real estate, chattels, or money," a legitimate claim of entitlement is required. *Roth*, 408 U.S. at 571–72.

Federal law also determines what procedural protections the Fourteenth Amendment requires. This is true even where state law is the source of the protected property right at issue. *See Cleveland Bd. of Educ. v.*

*Loudermill*, 470 U.S. 532, 541 (1985) ("the answer to the question of what process is due 'is not to be found in a [state] statute'"). Thus, although state action may constitute a breach of contract or a violation of state law, federal due process is *not* violated "every time a . . . government entity violates its own [procedural] rules." *Levitt v. Univ. of Texas at El Paso,* 759 F.2d 1224, 1230 (5th Cir. 1985) (emphasis added). Rather, "unless the conduct trespasses on federal constitutional safeguards, there is no [federal] constitutional deprivation." *Id.* In other words, where the procedures utilized satisfy the constitutional minimum, "entitlement to something more by virtue of [state rules] [is] a matter of state law, *not* [federal] constitutional law." *Id.* at 1231 (emphasis added). *See also Jackson v. Pierre,* 810 Fed. App'x 276, 279 (5th Cir. 2020) (summary calendar) (per curiam) (requirements of procedural due process not violated simply by virtue of officials' failure to comply with university's internal rules or policies); *Dearman v. Stone Cnty. Sch. Dist.*, 832 F.3d 577, 584 (5th Cir. 2016) (whereas denial of official nonrenewal hearing may have violated state law, federal due process was satisfied by receipt of notice and an opportunity to respond); *Brown v. Texas A&M Univ.*, 804 F.2d 327, 335 (5th Cir. 1986) (state university's failure to comport with internal procedures does not by itself amount to violation of federal due process requirements).

Federal procedural due process requirements are "flexible and call[] for such procedural protections as the particular situation demands." *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976). The core requirement of federal procedural due process is the "'opportunity to be heard at a meaningful time and in a meaningful manner.'"*Id.* at 333 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).

Conversely, a violation of substantive due process occurs, regardless of procedural protections, when (i) a governmental entity deprives a plaintiff of a constitutionally protected property interest; and (ii) the government's

deprivation lacks a rational basis. *See Simi Inv. Co., Inc. v. Harris Cnty.*, 236 F.3d 240, 249–50 (5th Cir. 2000); *see also Daniels*, 474 U.S. at 331 (procedural fairness is not determinative of substantive protections); *Franklin,* 49 F.4th at 435 (same). No substantive due process violation exists where it is "at least debatable" that a rational relationship with a conceivable legitimate government interest exists. *Simi Inv. Co.,* 236 F.3d at 251 (quoting *50 FM Properties Operating Co. v. City of Austin*, 93 F.3d 167, 174–75 (5th Cir. 1996)).

B.

Plaintiffs-Appellants maintain that the 2019 Ordinance deprived them of federal procedural due process protections by increasing their Hunters Crossing PID capital assessments without having timely satisfied the Texas PIDA Act's annual procedural requirements. Specifically, Plaintiffs-Appellants emphasize the absence of any record evidence that the Bastrop City Council—as purportedly required by Tex. Loc. Gov't Code §§ 372.013–372.017—annually reviewed and approved the developer's actual capital expenditures in excess of the capital costs estimated in the 2003 Ordinance and SAP and, during the same year that the additional costs were incurred, updated the SAP to reflect the adjusted amount of capital costs. In other words, Plaintiffs-Appellants maintain that 2019 Ordinance is unlawful because its $11,961,260 capital assessment includes capital cost "overruns" despite the City Council's failure to annually review and adjust the SAP to reflect the additional capital costs in the same years that they were incurred.

Plaintiffs-Appellants' substantive due process claims also allege an "increased assessment," but add the assertion that the 2019 Ordinance fails rational basis review. Specifically, because the City itself would bear no financial liability if the 2019 Ordinance were invalidated, Plaintiffs-Appellants maintain that the allegedly illegitimate purpose of the 2019 Ordinance is to benefit a private developer at the expense of Hunters Crossing PID property owners.

## C.

Having carefully considered the parties' submissions, the record in this matter, and applicable law, we find no reversible error in the district court's federal due process rulings and thus affirm the district court's judgment, relative to those claims, for the reasons stated herein. In reaching this decision, we note, at the outset, that the Texas PIDA Act is hardly a model of clarity.[8] Indeed, even at this stage of these proceedings, counsel for the parties seemingly cannot agree on the order in which various key events contemplated by the Texas PIDA Act occur and, in some instances, what those events entail.

Further complicating matters, the 2003 Ordinance and SAP reveal that City officials and the Hunters Crossing PID project developer originally contemplated a 25-year amortization period for the project's capital assessments. But, the planned public improvements also (1) involved a large, undivided and undeveloped tract of land that the developer/original owner was to subdivide, over time, into an undetermined number of privately-owned lots; and (2) was to be financed by means of a special property assessment (secured by a lien on the property) for which annual payments were not due and collected for each lot until such (undetermined) time that the developer transferred ownership of the lot. By virtue of this arrangement, the beginning and ending dates of the amortization payment periods for the individual lots within the Hunters Crossing PID are determined by the date on which the property developer transferred ownership of the lot and thus vary.

---

[8] Although the Texas Legislature has amended certain PIDA Act provisions in recent years, those amendments—given the relevant timeframe—do not apply here.

No. 21-51039

At the same time, section 372.018 of the Texas PIDA Act provides that an "assessment or reassessment . . . is a first and prior lien against the property assessed . . . [and] a personal liability of and charge against the owners of the property . . . that is effective from the date of the ordinance or order levying the assessment *until the assessment is paid*." *See* Tex. Loc. Gov't Code § 372.018 (emphasis added).  And, at least for the years between 2001 and 2009, section 372.017 provided that an assessment made payable in periodic installments "must continue for a period of time necessary to retire the indebtedness on the improvements." *See* Tex. Loc. Gov't Code § 372.017 (effective June 16, 2001–June 18, 2009) (as amended by Acts 2001, 77th Leg., ch. 1341, § 15, eff. June 16, 2001).[9]

Considering all of this information together, the staggered nature of the property owners' payment schedules, combined with apparently later-than-anticipated conveyances of at least some of the lots in the Hunters Crossing PID, has made the originally contemplated 25-year amortization schedule problematic. The same reasons seemingly necessitate the extended payment periods established by the 2019 Ordinance.

In any event, for purposes of this aspect of the instant appeal, Plaintiffs-Appellants challenge the federal constitutionality of the 2019 Ordinance, *not* the PIDA Act itself or the 2003 Ordinance and SAP.[10]  And

---

[9] In 2009, section 372.017 was amended, relative to the payment of assessments in periodic installments, to state, in pertinent part: "The installments . . . must continue for: (1) the period necessary to retire the indebtedness on the improvements; or (2) the period approved by the governing body for the payment of the installments." *See* Tex. Loc. Gov't Code Ann. § 372.017 (as amended by Acts 2009, 81st Leg., ch. 320, § 1, eff. June 19, 2009).

[10] Given that the applicable limitations period for claims asserted under 42 U.S.C. § 1983 is borrowed from state law, and Texas has a two-year limitations period for personal injury claims, Plaintiff-Appellants' focus on the 2019 Ordinance, rather than the 2003 Ordinance, or even the City Council's inaction during the interim years in which the bulk

the PIDA Act's various statutory complexities and uncertainties do not materially hinder our assessment of the specific federal due process claims at issue here.

As the district court concluded, the 2019 Ordinance and SAP, like the 2003 Ordinance and SAP, provide for a total capital assessment of $11,961,260. Additionally, although the $11,961,260 amount stated in the 2003 Ordinance and SAP includes an estimated $4,485,473 of capitalized interest in its total, the Texas PIDA Act, contrary to Plaintiffs-Appellants' assertions, does not clearly prohibit the inclusion of interest in an assessment. Nor have Plaintiffs-Appellants shown that the district court clearly erred in finding that the 2019 Ordinance and SAP properly confirmed the actual costs of the Hunters Crossing PID's capital improvements, credited past payments made on a parcel-by-parcel basis, and determined the special benefits received by properties on a parcel-by-parcel basis.

We recognize, of course, that the 2019 Ordinance's assessment is for $11,961,260 in capital *costs*, rather than the $7,475,787 of capital *costs* (exclusive of interest) plus $4,485,473 of capitalized *interest* that are estimated in the 2003 Ordinance and SAP documents. Importantly, however, Plaintiffs-Appellants' complaints regarding the capital costs incurred in excess of the 2003 estimate are *not* directed to alleged waste, fraud, or extravagance—or any other inappropriate labor/material expenditures— that presumably would have been discovered and disallowed if the Bastrop City Council had annually reviewed and adjusted the SAP for the Hunters Crossing PID during the same years that the additional capital costs were

---

of the construction work apparently was completed, is understandable. *See Redburn v. City of Victoria,* 898 F.3d 486, 496 (5th Cir. 2018) (courts considering the timeliness of § 1983 claims must borrow the relevant state's statute of limitations for personal injury actions); Tex. Civ. Prac. & Rem. Code § 16.003(a).

incurred. Instead, Plaintiffs-Appellants simply tout the City Council's failure to perform annual ministerial duties without showing any actual prejudice resulting from those omissions.

Specifically, Plaintiffs-Appellants maintain that, under the PIDA Act, the property developer "waived" its right to recover capital costs in excess of the amount estimated in the 2003 Ordinance and SAP by failing to ensure that the Bastrop City Council satisfied the PIDA Act's "annual review and adjustment requirements" during the same years in which the cost overruns were incurred. Contrary to Plaintiffs-Appellants' assertions, the Texas PIDA Act, despite requiring annual reviews and updates of the SAP, and permitting corresponding adjustments of the capital assessment for each property owner, does *not* explicitly mandate the "waiver" consequence urged by Plaintiffs-Appellants. Nor are we aware of any Texas jurisprudence concluding that one is implied. Certainly, none of the PIDA Act sections cited by the Plaintiffs-Appellants, in support of this "all or nothing" approach, expressly state that a governing body's failure to perform these ministerial duties automatically invalidates the property assessment and relieves the owners of property benefiting from the public improvements of the obligation to pay for them. *See* Tex. Loc. Gov't Code §§ 372.013–372.017. In fact, the Texas PIDA Act does not specify a statutory consequence for a violation of any of its requirements.

Given the numerous and evolving duties imposed upon and undertaken by municipal governing bodies like the Bastrop City Council, combined with the relative recency and complexity of the Texas PIDA Act, occasional administrative shortcomings are not surprising. Had the Texas Legislature intended for "any and all" such shortcomings—even in the absence of actual resulting prejudice—to automatically trigger the "waiver" consequence urged by Plaintiffs-Appellants, it could have easily said so. But, it did not. And, given the varied nature, size, and complexity of the myriad

of improvement projects authorized by the PIDA Act—some involving substantial financial expenditures and commitments, and extensive, if not irreversible, modifications of immovable property—that omission is significant, if not telling.[11]  In any case, we decline to infer that Texas law mandates such an extreme consequence in the absence of an unequivocal directive from the Texas Legislature or the Texas Supreme Court.[12]

Furthermore, the pertinent question presently before this court is whether Plaintiffs-Appellants were deprived of *federal* due process protections. Apparently failing to appreciate this point, Plaintiffs-Appellants maintain that "no process in 2019 would have been sufficient to satisfy the Constitution's minimum demands." Specifically, they reason that "the PIDA Act itself provides the procedures that the City was required to follow if it had wanted to adjust the assessment to incorporate the developer's overrun capital costs," and "[g]iven [that] the annual reviews had not taken place[], the 2019 Ordinance violates procedural due process."[13]

---

[11] Given the absence of a specified statutory consequence for any violation of the PIDA Act's requirements, it is conceivable that Texas legislators may have logically expected that property owners concerned about government inaction vis-à-vis third-party developers, contractors, suppliers, etc., would promptly seek to bring about compliance, including, if necessary, by applying for a writ of mandamus in state court.

[12] Given the obvious difficulty that local government officials, property developers, and experienced lawyers have had in understanding and applying the Texas PIDA Act, additional legislative efforts to clarify the legislation's requirements likely would prove beneficial to all.

[13] This argument also improperly lumps together two different deprivations: one is procedural (annual review and adjustment in the same year that a cost overrun occurs) and one is substantive (the 2019 capital assessment).  In the context of the Fourteenth Amendment's due process clause, "life, liberty, and property" are "substantive rights [that] cannot be deprived except pursuant to constitutionally adequate procedures." *Levitt* 759 F.2d at 1232. "The categories of substance and procedure are distinct." *Id.* And, "'[p]roperty' cannot be defined by the procedures provided for its deprivation any more than life or liberty." *Id.*

No. 21-51039

This argument, like Plaintiff-Appellants' "waiver" argument, again fails to recognize that federal law, *not* state law, dictates the procedural protections required by the Fourteenth Amendment's due process clause. And, the core requirement of federal procedural due process is the "'opportunity to be heard at a meaningful time and in a meaningful manner.'" *Mathews*, 424 U.S. at 333 (quoting *Armstrong*, 380 U.S. at 552). On the record before us, there is no indication that the Bastrop City Council, prior to passing and approving the 2019 Ordinance and SAP, on September 24, 2019, failed to provide sufficient notice and opportunity to be heard, at a meaningful time and manner, to Plaintiffs-Appellants and the other Hunters Crossing PID property owners.

To the contrary, the parties' submissions reflect that: (1) the City hosted a Hunters Crossing PID "Town Hall Meeting" at the Bastrop Convention Center, on August 19, 2019, to review the proposed 2019 SAP; (2) at the August 19, 2019 "Town Hall Meeting," City officials disseminated a four-page pamphlet (the "Town Hall Pamphlet") explaining the background and rationale for the proposed 2019 SAP, as well as its contents, and providing instructions for the submission of questions and comments for the City Council to consider prior to its September 10, 2019 meeting; (3) on August 31, 2019, the City published a notice in the *Bastrop Advertiser* of a public hearing to be held, on September 10, 2019, to consider the 2019 SAP; (4) the minutes of the September 10, 2019 City Council meeting reflect that a public hearing was held on that date regarding the 2019 Ordinance, the 2019 SAP, and the Fiscal Year 2020 Assessment Roll, during which the City Council heard from a number of speakers, including counsel for Plaintiffs-Appellants, before approving the first reading of the 2019 Ordinance; (5) on September 12, 2019, the City published notice in the *Bastrop Advertiser* of a public hearing to be held on September 24, 2019 to consider the 2019 SAP; and (6) on September 24, 2019, the City Council met in a public meeting during which

20

the 2019 Ordinance and SAP were approved and adopted after a second reading.

Nor have we been given any reason to think that any valid objections to particular capital cost amounts could not have been adequately considered by the City Council, in 2019, prior to voting on the 2019 Ordinance and 2019 SAP. For instance, Plaintiffs-Appellants have not shown that events occurring between the time that the capital cost overruns were incurred and the City Council's consideration of the proposed 2019 Ordinance and SAP somehow deprived them of previously available pricing or other relevant information. Indeed, on the instant record, it is far from clear that the capital improvement project's final figures differ from those that would apply if the City *had* previously performed the annual SAP review and adjustments in the same years that capital cost amounts exceeding the 2003 estimate were incurred. Thus, for all these reasons, we are not convinced that Plaintiffs-Appellants were not accorded the *procedural* protections required by the Fourteenth Amendment's due process clause.

Now turning to the *substantive* due process challenges asserted by Plaintiffs-Appellants, we conclude those claims likewise lack merit. Although the capital assessments set forth in the 2019 Ordinance and SAP certainly constitute governmental deprivations of a protected property interest, such deprivations do not violate substantive due process protections unless they lack a rational basis. *See, e.g., Simi Inv. Co.,* 236 F.3d at 251. Notably, a government entity's failure to follow the procedures established by state law does not automatically render that conduct arbitrary or unrelated to a legitimate state interest. *See Stern v. Tarrant Cnty. Hosp. Dist.*, 778 F.2d 1052, 1060 (5th Cir. 1985) (rejecting the notion that "state law defines . . . which means to a chosen goal are rational, [because] then all intentional violations of state law by state agencies would violate the fourteenth amendment"); *see also Levitt,* 759 F.2d at 1233 (rejecting assertion that a "state's failure to

follow its own [procedural] rules is a per se deprivation of substantive due process").

Nor does the fact that the City would bear no financial responsibility to the project developer for capital costs in excess of the 2003 estimated amount—if the 2019 Ordinance were invalidated—necessarily divest the 2019 Ordinance of a rational basis.  To the contrary, ensuring that persons who have provided goods and/or services, as part of a PIDA Act project, are fairly compensated by the owners of property specially benefitting from the resulting improvements is entirely consistent with the purpose of the PIDA Act. Otherwise, public improvements made possible by the PIDA Act might cease to exist if third-party providers were to become unwilling to participate in such projects because of concerns that inconsequential government short-comings might ultimately deprive them of reasonable compensation.

This is particularly true where, as here, it is not apparent that the Hunters Crossing PID's total capital assessment actually increased as a result of the City Council's admitted administrative shortcomings, and invalidating the 2019 Ordinance seemingly would provide a windfall to the property owners who have benefited from the public improvements.  Accordingly, on the showing made, we are not convinced that the 2019 Ordinance lacks the rational basis required by the Fourteenth Amendment's substantive due process protections.

For the foregoing reasons, we, like the district court, are not persuaded that Plaintiffs-Appellants suffered actionable violations of the procedural and substantive protections guaranteed by the Fourteenth Amendment's due process clause.  Accordingly, we affirm the district

No. 21-51039

court's judgment to the extent that it rejected the Plaintiffs-Appellants' due process claims.[14]

## IV.

Plaintiffs-Appellants also contend that the district court erred in rejecting their assertions that the 2019 Ordinance violates the Texas Constitution's prohibition against retroactive laws. Specifically, Article I, section 15 of the Texas Constitution states: "No bill of attainder, ex post facto law, retroactive law, or any other law impairing the obligations of contracts, shall be made." *See* Tex. Const. art. I, sec. 16. A retroactive law "is one which gives pre-enactment conduct a different legal effect from that which it would have had without the passage of the statute." *Union Carbide Corp. v. Synatzske*, 438 S.W.3d 39, 60 (Tex. 2014).

Plaintiffs-Appellants argue the 2019 Ordinance is "a textbook instance of retroactive lawmaking" because it "adjusts the assessments by incorporating the developer's overrun costs incurred many years earlier, despite the fact that the City never reviewed these costs in the years that they were incurred." Thus, Plaintiffs-Appellants maintain, "the 2019 Ordinance gives the City's and developer's pre-enactment conduct 'a different legal effect than that which it would have had[.]'"

---

[14] As stated above, the district court determined that the PIDA Act's establishment of procedural requirements for the adjustment of property assessments "creat[ed] a [federally protected] property interest for individuals within the PID." Considering all of the legal principles discussed herein, as well as the Texas Legislature's failure to have expressly legislated a specific consequence for noncompliance with the PIDA Act's annual review and adjustment requirements, when it easily could have done so, we disagree. Nevertheless, for the reasons stated, we affirm the district court's judgment relative to the federal due process claims asserted by Plaintiffs-Appellants.

No. 21-51039

Although the district court entered a "Final Judgment" awarding judgment in favor of the defendants, and further ordered that "all relief not specifically granted is denied," the district court did not expressly address Plaintiffs-Appellants' claims asserted under the Texas Constitution in its post-trial findings of fact and conclusions of law. On this limited record, we are left to speculate regarding the scope and substance of the district court's assessment of Plaintiffs-Appellants' state-law claims and, thus, are unable to provide adequate appellate review. Accordingly, we vacate the district court's judgment relative these claims and remand them to the district court for further consideration and/or a statement of reasons for judgment.

## V.

As stated herein, the district court's September 29, 2021 judgment in favor of Defendants-Appellees is AFFIRMED IN PART, VACATED IN PART, and REMANDED IN PART.

24